ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
 – and –
BRIAN E. COCHRAN (286202)
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>INTEL CORPORATION, PATRICK P. GELSINGER, and DAVID ZINSNER,<br><br>Defendants. | Case No.    3:24-cv-04807<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff Construction Laborers Pension Trust of Greater St. Louis ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings, public statements and press releases by Intel Corporation ("Intel" or the "Company"), as well as media and analyst reports about Intel and the facts alleged herein.[1]  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of Intel common stock between January 25, 2024 and August 1, 2024, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against Intel and certain of Intel's current senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      Jurisdiction is conferred by §27 of the Exchange Act, 15 U.S.C. §78aa.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

3.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because Intel is headquartered, conducts business, and resides in this District, and the events and omissions giving rise to the claims asserted herein occurred in substantial part in this District, including the dissemination of false and misleading statements in and from this District.

---

[1]      Emphasis has been added unless otherwise noted.

4.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

5.     Plaintiff Construction Laborers Pension Trust of Greater St. Louis, as set forth in the accompanying certification that is incorporated by reference herein, purchased and acquired Intel common stock during the Class Period and has been damaged thereby.

6.     Defendant Intel is a technology company with its principal executive offices located in Santa Clara, California.  Intel common stock is listed and publicly traded on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "INTC."

7.     Defendant Patrick P. Gelsinger ("Gelsinger") served as Intel's Chief Executive Officer ("CEO") and a member of its Board of Directors during the Class Period.

8.     Defendant David Zinsner ("Zinsner") served as Intel's Executive Vice President and Chief Financial Officer ("CFO") during the Class Period.

9.     Defendants referenced in ¶¶7-8 above are referred to herein as the "Individual Defendants."  The Individual Defendants and Intel are referred to herein as "defendants."

10.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of Intel at the highest levels and was privy to confidential proprietary information concerning Intel and its business, operations, plans, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, and were aware of, or recklessly disregarded, the false and misleading statements being issued about Intel and approved or ratified these statements, in violation of the federal securities laws.

11.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to Intel's operations, business, expenditures, and present and future business prospects, including information

1  concerning Intel's foundry business.  Defendants' false and misleading misrepresentations and

2  omissions during the Class Period violated these specific requirements and obligations.

3       12.    The Individual Defendants, because of their positions of control and authority as

4  officers and/or directors of Intel, were able to, and did, control the contents of various SEC filings,

5  press releases, and other public statements pertaining to Intel and its foundry business.  Each

6  Individual Defendant was provided with copies of the documents alleged herein to be false and

7  misleading before or shortly after their issuance, participated in conference calls with investors

8  during which false and misleading statements were made, and had the ability and opportunity to

9  prevent the statements' issuance or cause them to be corrected.  Accordingly, each Individual

10  Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore,

11  primarily liable for the representations contained therein.

12  **BACKGROUND**

13       13.    Intel is a global integrated design manufacturer ("IDM") for central processing units

14  ("CPUs"), semiconductor chips, and related solutions.  Intel's CPUs are incorporated into computing

15  and related end products and services.  The Company's customers include original equipment

16  manufacturers ("OEMs"), original design manufacturers ("ODMs"), cloud service providers, and

17  other manufacturers and service providers.[2]  Intel manufactures its products at its fabrication and

18  assembly and test facilities located throughout the world.

19       14.    For decades, Intel has been a dominant force in the manufacturing of semiconductor

20  chips and microprocessors.  However, in recent years, Intel has come under increased competitive

21  pressures from companies such as Advanced Micro Devices ("AMD"), Nvidia, Taiwan

22  Semiconductor Manufacturing Co. ("TSMC"), Samsung Electronics, and Silicon Integrated Systems.

23  In late 2020, activist investor Third Point began pressuring Intel to consider strategic alternatives to

24  turn around flagging results.  Third Point lamented that Intel had ceded market share to rivals in

25  microprocessor manufacturing and its core PC and data center markets and had failed to timely

26  pursue promising opportunities in artificial intelligence ("AI").

27  ---
[2]    OEMs design and build a product to its own specifications, whereas ODMs design and build

28  a product to another company's specifications.

15.     Partially in response to this pressure, in January 2021 Intel announced that defendant Gelsinger would be replacing its then-current CEO, Bob Swan.  Defendant Gelsinger had begun his career at Intel and previously served as the Company's Chief Technology Officer.  The market hailed defendant Gelsinger's return to the Company, causing the price of Intel stock to rise approximately 10% in response to the Gelsinger announcement.

16.     In March 2021, in his first extended remarks since becoming Intel's CEO, defendant Gelsinger told investors that the Company would invest in becoming a leader in chip manufacturing. Rather than simply designing chips that would be outsourced to be manufactured by other firms, defendant Gelsinger stated that Intel would bolster its in-house manufacturing capabilities and pursue other strategic initiatives, a vision he dubbed "IDM 2.0."  In service of this goal, defendant Gelsinger announced the launch of Intel Foundry Services ("IFS"), a fully vertical stand-alone foundry business dedicated to manufacturing Intel chips in-house, as well as a $20 billion investment to build chip factories in the United States.  Gelsinger declared: "We're bringing back the execution discipline of Intel. . . .  Intel is back . . . ."

17.     In subsequent months, Intel executives highlighted the purported cost savings and efficiencies that would be achieved by the Company's new foundry model and its in-house chip manufacturing focus.  For example, during Intel's Annual Investor Day held in February 2022, defendant Zinsner stated he had "high confidence" that Intel's gross margins could range as high as 58% by 2025, and likely run even "higher than this."

18.     In October 2022, defendant Gelsinger released a statement that Intel would be implementing the "next phase" of IDM 2.0, which involved the adoption of an internal foundry model.  That same month, Intel reported its financial results for its third fiscal quarter ended October 1, 2022.  During a related earnings call, defendant Gelsinger revised upward the expected profitability improvements that could be obtained by the Company's foundry efforts to 60% gross margins and 40% operating margins.

19.     In June 2023, defendant Zinsner and other Intel officials provided analysts and investors with an update on the Company's new foundry model during a webinar.  The event's purpose was to explain the internal foundry model and its purported financial and competitive

benefits.  Among other things, investors and analysts were told that Intel's transition to a new internal foundry model would unlock cost savings of $8 to $10 billion exiting 2025.  Intel projected increased efficiencies as a result of this change that would be reflected in greater profitability and ultimately the achievement of its 60% gross margin and 40% operating margin expectations.  According to defendant Zinsner: "We think we have a good path to 60% [gross margins]."

20.     That same day, Intel issued an "Update on [Its] Internal Foundry Model" which claimed that turnaround efforts were "well on track" while highlighting Intel's new reporting structure.  The release highlighted $8 to $10 billion in expected cost savings exiting 2025, the achievement of the Company's long-term target of 60% gross margins and 40% operating margins, and operational IFS tailwinds that would purportedly be obtained by the reorganization, stating in pertinent part as follows:

> Intel is embarking on the most significant business transformation in its 55-year history.  With IDM 2.0, Intel set out to regain process technology leadership, expand the use of third-party foundry capacity and build a world-class foundry business with a significant expansion of Intel's manufacturing capacity.  With these efforts well on track, Intel now is making a fundamental shift in how its product business units work with technology development and manufacturing to ensure long-term growth while achieving efficiencies and cost savings.

> In this new "internal foundry" model, Intel's product business units will engage with the company's manufacturing group in a similar arm's-length fashion that fabless semiconductor companies engage with external foundries.

> Intel's internal foundry model is key to the company's overarching IDM 2.0 strategy – with the aim to return margins to their historic range and ambitions to serve a far wider variety of chip customers worldwide.  The internal foundry model is also integral to Intel's multiyear cost efficiency effort, which includes reducing costs by $3 billion in 2023, and $8 billion to $10 billion in cost savings exiting 2025 – which is where the new model plays a significant role.

> *       *       *

> The internal foundry model offers significant inherent business value beyond billions of dollars in cost savings.  Intel will extend the use of market-based pricing to its internal business units, offering them the same certainty and stability as the company's external customers.  Intel will maintain the intimacy and deep connection between its product groups and technology development teams, preserving the competitive advantages it has had as an IDM.  The new model also provides a tailwind to IFS by effectively creating the industry's second-largest foundry (by volume from internal customers), allowing external customers to build off Intel's internal scale and de-risking the process.

> Intel's manufacturing groups will face the same market dynamics as their external foundry counterparts and need to compete for volume through performance

and price.  This includes Intel's internal customers, who will have the flexibility over time to engage with third-party foundries.  It's not an entirely new notion for Intel, however; today, roughly 20% of Intel's silicon is manufactured externally.

\*          \*          \*

**Supporting Long-Term Margin Ambitions**

Intel's long-term ambitions are to achieve non-GAAP gross margins of 60% and operating margins of 40%.  The internal foundry model will highlight new opportunities and lead to an optimized cost structure in furtherance of these goals.

21.     In addition, Intel announced that its manufacturing groups would be held accountable on a standalone profit and loss basis going forward.  Historically, the Company's foundry unit results had been consolidated with other operating results, obscuring the true profit and loss dynamics of the Company's in-house manufacturing efforts.  Beginning in the first fiscal quarter of 2024, the Company stated that it would break out its manufacturing group as a standalone operating segment – inclusive of manufacturing, technology development, and IFS – along with the Company's product group reporting segments.

22.     As recently as January 25, 2024, defendant Gelsinger told investors that Intel had "consistently executed on our . . . foundry plans" and that he "could not be prouder of the execution across our process technology roadmap in 2023."  He further stated that Intel had "exited the year accomplishing exactly what we set out to do" and had "improved our execution engine consistently being on track or ahead on our process and product road map."

23.     Unbeknownst to investors, however, Intel's foundry business was floundering, costing billions of dollars more than investors had been led to believe even while revenue growth in the division actually ***declined*** during the Class Period.  These trends undermined Intel's strategic initiatives, margin trajectory, and the Company's overall business and prospects.  Despite knowing or recklessly disregarding these adverse developments, defendants made materially false and misleading statements regarding Intel's manufacturing capabilities and the trajectory of its foundry segment which caused Intel stock to trade at artificially inflated prices during the Class Period.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

24.     The Class Period begins on January 25, 2024.  On that date, Intel issued a press release announcing the Company's fourth fiscal quarter and full-year ended December 30, 2023 (the "FY23 Press Release").[3]  The release highlighted the purported success of the Company's various business units, including most notably IFS which was reportedly "up 63%" versus the prior year period:

| Business Unit Revenue and Trends | Q4 2023 | vs. Q4 2022 | 2023 | vs. 2022 |
|---|---|---|---|---|
| Client Computing Group (CCG) | $8.8 billion | up 33% | $29.3 billion | down 8% |
| Data Center and AI (DCAI) | $4.0 billion | down 10% | $15.5 billion | down 20% |
| Network and Edge (NEX) | $1.5 billion | down 24% | $5.8 billion | down 31% |
| Mobileye | $637 million | up 13% | $2.1 billion | up 11% |
| Intel Foundry Services (IFS) | $291 million | up 63% | $952 million | up 103% |

25.     Defendant Zinsner was quoted in the FY23 Press Release as claiming that the Company's internal foundry business would "unlock further efficiencies in 2024," stating in pertinent part as follows:

> "***We continued to drive operational efficiencies in the fourth quarter***, and comfortably achieved our commitment to deliver $3 billion in cost savings in 2023. ***We expect to unlock further efficiencies in 2024 and beyond as we implement our new internal foundry model***, which is designed to drive greater transparency and accountability and higher returns on our owners' capital."

26.     Also on January 25, 2024, Intel hosted a conference call with analysts and investors led by defendants Gelsinger and Zinsner to discuss the Company's fiscal 2023 financial and operating results.  In his prepared remarks, defendant Gelsinger highlighted the purported success of the Company's foundry business and in particular that it supported the Company's ostensible profit margin trajectory, stating in pertinent part as follows:

> ***[W]e expect sequential and year-on-year growth in both revenue and EPS for each quarter of fiscal year '24.***
>
> *       *       *
>
> ***Third-party engagements with IFS continue to validate our progress on [process] technology***.  We launched IFS with a long-term view of delivering the

---

[3]     Intel's fiscal year ends on the last Saturday in December.

world's first system foundry that brings together a secure and sustainable supply chain with the best of Intel and our ecosystem. While our ambitions will not materialize overnight, *we made tremendous progress in both Q4 and fiscal year '23 towards our goal of becoming the second largest external foundry by 2030.*

The rapid adoption of AI by all industries is proving to be a significant tailwind for IFS as high-performance compute, an area where we have considerable wafer and packaging know-how and IP is now one of the largest, fastest-growing segments of the semiconductor market.

\* \* \*

*Our success with IFS will be measured by customer commitments and revenue. We have taped out more than 75 ecosystem and customer test chips.* IFS already has more than 50 test chips in the pipeline across 2024 and 2025, 75% of which are on Intel 18A.

\* \* \*

*The momentum in advanced packaging is very strong and is another facet of our foundry strategy, which is clearly benefiting from the surge of interest in AI.* With leadership technology and available capacity, *our opportunity set continues to grow.* In total, across wafer and advanced packaging, our lifetime deal value for IFS is now over $10 billion, more than doubling from the $4 billion we provided in our last update.

\* \* \*

*As our new internal foundry model, which is designed to drive greater transparency, accountability and focus on cost begins to take root, we expect to unlock further cost savings and efficiencies in 2024 and beyond.* We have officially transitioned to this new operating model on January 1, and we'll report the new segmentation format as part of our Q1 earnings. *We see incremental efficiencies as we drive to our longterm model of 60% gross and 40% operating margins.*

27.     In connection with the January 25, 2024 earnings call, defendants provided investors with a slide show presentation which was headed by the pictures and names of the Individual Defendants and claimed that the Company's foundry business had helped drive ">$3B in FY'23" operating efficiencies and "Financial Discipline," as stated in the following slide:



28.     On January 26, 2024, Intel filed with the SEC its annual report on Form 10-K for its fiscal year ended December 30, 2023, which was signed by defendants Gelsinger and Zinsner, who also provided certifications as to the filing's completeness and accuracy ("FY23 Form 10-K").  The FY23 Form 10-K contained the financial information provided in the FY23 Press Release.  In addition, the FY23 Form 10-K stated that the Company's foundry business was experiencing robust momentum and customer commitments, accelerating revenue growth, and lower segment losses as a percentage of revenue compared to fiscal 2022, stating in pertinent part as follows:

> We believe the Open System Foundry model delivers differentiated capabilities to help our customers lead in their industries while bringing stability to the global semiconductor supply chain.  ***The momentum and customer commitments we are seeing demonstrate that our strategy and offerings are resonating, and we look to build on this success in 2024 and in future periods***.



29.     On March 6, 2024, defendant Zinsner presented at the Morgan Stanley Technology, Media & Telecom Conference regarding Intel.  In answer to an analyst question, defendant Zinsner encouraged investors to view the Company's foundry business as "a significant tailwind to the earnings of the company" because of present opportunities.  Later in the call, defendant Zinsner again highlighted the profit potential of the foundry business, stating in pertinent part as follows:

> *We can be profitable, meaningfully profitable in the foundry space, be well underneath what the leading player in the space is, and still drive significant profitability for the overall Intel company because we get the margin stacking benefit in at least the part of the business that we sell into our own fabless portion of our business*.  So that's really the way I kind of think about it.
>
> And I think the last piece of this is kind of restructuring how we manage the business.  So we look at the entire manufacturing and TD footprint as a separate P&L and kind of manage the company accordingly to that.  *And I think we'll start to see a lot of the efficiencies that we think we can yield and get ourselves more competitive from a cost structure from managing the business in that way*.

30.     On March 28, 2024, Intel published its Annual Report to Security Holders.  The report contained an introductory letter from defendant Gelsinger which stated in relevant part as follows:

> *While still early in our foundry journey, we are seeing significant traction. We* began 2023 with a commitment from one Intel 18A foundry customer and ended the year with four.  *We also achieved five advanced packaging wins, a testament to the advantages of Intel Foundry*.
>
> *To support the growing demand for our foundry offering, we continued to expand our manufacturing capacity and capabilities*.

31.     The statements referenced in ¶¶24-30 above were materially false and misleading when made because they failed to disclose the following adverse facts pertaining to Intel's business, operations, and financial condition, which were known to or recklessly disregarded by defendants as follows:

(a)     that Intel's foundry unit was suffering from ballooning costs and required substantially more capital expenditures than investors had been led to believe and, as a result, had suffered $7 billion in losses in 2023;

(b)     that Intel's foundry unit had suffered a negative 37% operating margin in 2023 and was years away from positively contributing to the Company's profits margins;

(c)    that, in 2024, Intel's foundry unit was on track to eclipse the staggering losses it had suffered in the prior year;

(d)    that, despite monumental investment by the Company, Intel's foundry unit was actually suffering declining revenues during the Class Period;

(e)    that, as a result of (a)-(d) above, Intel was running years behind its stated long-term profitability targets of 60% gross margins and 40% operating margins and such targets lacked a reasonable factual basis; and

(f)    that, as a result of (a)-(e) above, defendants had materially misrepresented the economics and viability of the Company's new foundry business, Intel's overall business prospects, and the timeline for when the purported benefits of Intel's vaunted IDM 2.0 strategy could be achieved, if ever.

32.    Then, on April 2, 2024, Intel issued a press release and filed with the SEC a Form 8-K detailing the Company's new reporting structure and providing historical results for the Company's foundry business on a standalone basis. Shockingly, Intel revealed that its foundry business had suffered **$7 billion** in losses and a dismal **negative 37%** operating margin in 2023. Both metrics were substantially worse than the unit had experienced in either fiscal 2022 or 2021, undermining defendants' Class Period statements regarding the trajectory of the business and its contributions to the Company's overall profitability.

33.    On a related conference call with investors, defendant Gelsinger revealed that, despite the surprising losses suffered by the unit in 2023, Intel's foundry losses were expected to **further increase** in 2024. Similarly, defendant Zinsner disclosed that Intel was still years away from breaking even in the segment and that the Company was not actually on track to achieve 40% gross margins and 30% operating margins until 2030, four years later than the market had previously been led to believe. Defendant Zinsner further admitted that Intel's prior reporting had "obscur[ed] the underlying economics of both" its foundry and product businesses.

34.    Investors and analysts reacted with shock and dismay. According to one analyst: "The idea that a -37% operating margin and $7B loss do not yet represent a trough is somewhat breathtaking especially given all the cost cuts the company was supposedly implementing last year."

1    On this news, the price of Intel stock fell from $43.94 per share at market close on April 2, 2024 to

2    $40.33 per share by market close on April 3, 2024, a decline of 8% on abnormally high volume of

3    over 83 million shares traded.  The price of the stock continued to decline in subsequent trading

4    sessions on elevated volume, closing at $37.98 per share on April 8, 2024.  However, because

5    defendants failed to disclose the full truth or extent of the problems impacting the Company and its

6    foundry business, the price of Intel stock remained artificially inflated.

7          35.     Thereafter, on April 25, 2024, Intel surprised investors again by revealing that Intel's

8    foundry segment revenue had declined 10% year-over-year during the first fiscal quarter of 2024,

9    while the unit suffered an approximately $2.5 billion quarterly loss.  On this news, the price of Intel

10    stock fell from $35.11 per share at market close on April 25, 2024 to $31.88 per share by market

11    close on April 26, 2024, a decline of 9% on abnormally high volume of over 119 million shares

12    traded.  However, because defendants failed to disclose the full truth or extent of the problems

13    impacting the Company and its foundry business, the price of Intel stock remained artificially

14    inflated.

15          36.     Finally, on August 1, 2024, Intel revealed that the problems surrounding its foundry

16    business were far more severe than previously disclosed.  In connection with reporting its fiscal

17    second quarter of 2023 results, Intel stated that its foundry segment's revenue had fallen sequentially

18    to $4.3 billion even as segment operating losses continued to climb.  Intel also announced a $10

19    billion cost reduction plan, which included laying off 15% of the Company's workforce and

20    suspending dividend payments, and a variety of other emergency measures designed to improve the

21    Company's "efficiency and market competitiveness."  Intel further disclosed it was on track to

22    achieve only between $12.5 billion and $13.5 billion in revenue for its third fiscal quarter of 2024,

23    well below consensus analyst estimates of $14.4 billion, and which represented an 8% decline from

24    the prior comparable year period at the midpoint.  On this news, the price of Intel stock fell from

25    $29.05 per share at market close on August 1, 2024 to $21.48 per share by market close on August 2,

26    2024, a decline of 26% on abnormally high volume of over 300 million shares traded.  The decline

27    was reportedly the worst daily performance of Intel stock since at least 1985.

28

37.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of Intel stock, plaintiff and other Class members (defined below) have suffered significant losses and damages for which they seek redress through this action.

## ADDITIONAL SCIENTER ALLEGATIONS

38.     As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of Intel, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Intel and its foundry business, and their control over and/or receipt and/or modification of Intel's materially false and misleading statements, were responsible for the fraudulent scheme alleged herein.

39.     Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of Intel, including the Individual Defendants.

40.     The Individual Defendants, because of their positions with Intel, controlled the contents of Intel's public statements during the Class Period and were intimately involved in overseeing Intel's foundry business.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

41.     Moreover, the Individual Defendants personally oversaw the implementation of IDM 2.0 and the "transformation" of Intel around its foundry business.  Defendant Gelsinger launched IDM 2.0 soon after becoming Intel's CEO and has personally staked his legacy on the effort, with the close involvement and participation of defendant Zinsner.  The Individual Defendants held themselves out as the persons most knowledgeable about efforts to transform Intel around its manufacturing capabilities in conference calls and presentations with investors.  The building of a profitable foundry segment was the most important strategic initiative being pursued at the Company during the Class Period and closely watched by analysts and investors, with extremely consequential implications for the Company's ultimate success or failure and the market's view of the Individual Defendants' stewardship over the business.  Thus, the Individual Defendants were heavily incentivized to portray Intel's effort to build up its foundry capacity as more successful than it in fact was and to downplay the challenges facing Intel's manufacturing buildout during the Class Period.

42.     In addition, the materially misrepresented information concealed from investors during the Class Period relates to the *past* performance of Intel's foundry segment.  Defendants utilized Intel's historical reporting to obscure the true costs of building up the Company's foundry business and profit trajectory prior to and during the Class Period.  Given the historical nature of the adverse information and the fact that it was previously incorporated into Intel's consolidated results (although not disclosed to outside investors in a manner that would enable them to understand the truth), defendants knew or recklessly disregarded that the statements detailed herein were materially false and misleading when made.

## NO SAFE HARBOR

43.     Defendants' "Safe Harbor" warnings accompanying their reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in Intel's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

44.     Defendants are also liable for any false or misleading FLS pled because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and approved by an executive officer of Intel who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

### APPLICATION OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET

45.     At all relevant times, the market for Intel common stock was an efficient market for the following reasons, among others:

(a)     Intel common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     according to Intel's Form 10-K for the fiscal year ended December 30, 2023, Intel had more than 4.2 billion shares outstanding as of January 19, 2024;

(c)     as a regulated issuer, Intel filed periodic public reports with the SEC;

(d)     Intel regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about Intel was rapidly reflected in and incorporated into the price for Intel stock during the Class Period.

46.     As a result of the foregoing, the market for Intel stock promptly digested current information regarding Intel from publicly available sources and reflected such information in the price of Intel stock.  Under these circumstances, all purchasers of Intel stock during the Class Period suffered similar injury through their purchases of Intel stock at artificially inflated prices, and a presumption of reliance applies.

47.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding Intel's business, operations, and guidance, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## LOSS CAUSATION/ECONOMIC LOSS

48.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Intel stock and operated as a fraud or deceit on Class Period purchasers of Intel stock by misrepresenting the value of Intel's business and prospects by concealing the true costs and problems impacting the Company's foundry business.  As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of Intel stock fell precipitously as the prior artificial inflation came out of the stock's price and the concealed risks transpired.  As a result of their purchases of Intel stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Intel common stock during the Class Period (the "Class").  Excluded from the Class are defendants, the officers and directors of Intel, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Intel stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be

1   ascertained through appropriate discovery, plaintiff believes that there could be hundreds or

2   thousands of members in the proposed Class.  Record owners and other members of the Class may

3   be identified from records maintained by Intel or its transfer agent and may be notified of the

4   pendency of this action by mail, using the form of notice similar to that customarily used in

5   securities class actions.

6        51.     Plaintiff's claims are typical of the claims of the members of the Class as all members

7   of the Class are similarly affected by defendants' wrongful statements and conduct in violation of

8   federal law that is complained of herein.

9        52.     Plaintiff will fairly and adequately protect the interests of the members of the Class

10  and has retained counsel competent and experienced in class and securities litigation.

11       53.     Common questions of law and fact exist as to all members of the Class and

12  predominate over any questions solely affecting individual members of the Class.  Among the

13  questions of law and fact common to the Class are:

14             (a)     whether defendants violated the Exchange Act as alleged herein;

15             (b)     whether statements made by defendants misrepresented or omitted material

16  facts about the business, operations, and prospects of Intel;

17             (c)     whether defendants acted with scienter; and

18             (d)     to what extent the members of the Class have sustained damages and the

19  proper measure of damages.

20       54.     A class action is superior to all other available methods for the fair and efficient

21  adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

22  damages suffered by individual Class members may be relatively small, the expense and burden of

23  individual litigation make it impossible for members of the Class to individually redress the wrongs

24  done to them.  There will be no difficulty in the management of this action as a class action.

25                              **COUNT I**

26            **For Violation of §10(b) of the Exchange Act and SEC Rule 10b-5**
               **Against All Defendants**
27

         55.     Plaintiff incorporates ¶¶1-54 by reference.
28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 17 -

56.     During the Class Period, defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

57.     Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Intel stock during the Class Period.

58.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Intel stock.  Plaintiff and the Class would not have purchased Intel stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements and fraudulent scheme.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

59.     Plaintiff incorporates ¶¶1-58 by reference.

60.     Defendants acted as controlling persons of Intel within the meaning of §20(a) of the Exchange Act.  By reason of their positions with Intel and/or ownership of Intel stock, the Individual Defendants had the power and authority to cause Intel to engage in the wrongful conduct complained of herein.  Intel controlled the Individual Defendants and all of its employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

1

## PRAYER FOR RELIEF

2        WHEREFORE, plaintiff prays for relief and judgment, as follows:

3        A.      Determining that this action is a proper class action, designating plaintiff as Lead

4    Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil

5    Procedure and plaintiff's counsel as Lead Counsel;

6        B.      Awarding compensatory damages in favor of plaintiff and the other Class members

7    against all defendants, jointly and severally, for all damages sustained as a result of defendants'

8    wrongdoing, in an amount to be proven at trial, including interest thereon;

9        C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

10   action, including counsel fees and expert fees; and

11       D.      Awarding such equitable, injunctive, or other relief as deemed appropriate by the

12   Court.

13

## JURY DEMAND

14       Plaintiff demands a trial by jury.

15   DATED: August 7, 2024                ROBBINS GELLER RUDMAN
                                            & DOWD LLP
16                                        SHAWN A. WILLIAMS

17

18                                            s/ Shawn A. Williams
                                          SHAWN A. WILLIAMS
19
                                          Post Montgomery Center
20                                        One Montgomery Street, Suite 1800
                                          San Francisco, CA  94104
21                                        Telephone:  415/288-4545
                                          415/288-4534 (fax)
22
                                          ROBBINS GELLER RUDMAN
23                                          & DOWD LLP
                                          BRIAN E. COCHRAN
24                                        655 West Broadway, Suite 1900
                                          San Diego, CA  92101-8498
25                                        Telephone:  619/231-1058
                                          619/231-7423 (fax)
26
                                          Attorneys for Plaintiff
27

28

COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS -                    - 19

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

CONSTRUCTION LABORERS PENSION TRUST OF GREATER ST. LOUIS ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:  *See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

*Studen v. Funko, Inc.*, No. 2:23-cv-00824 (W.D. Wash.)

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _07_ day of August, 2024.

CONSTRUCTION LABORERS PENSION
TRUST OF GREATER ST. LOUIS

By: _____
Donald Willey, Chairman

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 02/01/2024 | 35,700 | $43.34 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 03/22/2024 | 1,535 | $42.22 |

Prices listed are rounded up to two decimal places.